***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Holmes with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were correctly designated and subject to and bound by the provisions of the Workers' Compensation Act. *Page 2 
2. The employer-employee relationship existed between Michael Coe and Resolve Staffing, Inc., on August 2, 2006
3. Resolve Staffing was, at all relevant times, insured for claims under the North Carolina Workers' Compensation Act by AIG Claims Services.
4. Plaintiff sustained an admittedly compensable injury by accident on August 2, 2006. Plaintiff contends, and defendants deny, that plaintiff continues to be disabled as a result of this accident.
5. Certain medical records, rehabilitation reports, and vocational records relevant and related to this claim were stipulated into evidence without further authentication, and may be accepted as substantive evidence.
6. Plaintiff was paid temporary total disability benefits in a lump sum in the amount of $3,520.02 for the period from August 2, 2006, up to and including October 31, 2006, when plaintiff was released to return to work by Dr. Ellison.
7. Copies of the documents filed with the Industrial Commission pertaining to this matter may be introduced into evidence without further proof of authenticity.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 46 years old at the time of the evidentiary hearing and has lived in the Landis, North Carolina area since 1974. Plaintiff obtained his GED while in the military in 1982. *Page 3 
2. Plaintiff began his employment as a maintenance technician with Resolve Staffing ("Resolve") in June or July of 2006. Plaintiff was assigned, through Resolve, to work at Carolina Roller Mills Salisbury, North Carolina facility, where his job duties included repairing broken machines and general facility maintenance such as repairing broken water lines, steam lines, and replacing motors when they burned out.
3. Plaintiff sustained a compensable injury by accident on August 2, 2006, when, he picked up a box containing a motor and felt a sharp, stabbing pain in his back.
4. On August 4, 2006, plaintiff underwent an MRI at Rowan Regional Medical Center, which revealed a small left paramedian focal protrusion and focal annular tear without herniation at L1-2 and L2-3, as well as a right posterolateral focal protrusion and annular tear with slight herniation at L4 and L5 with a slight flattening of the thecal sac. Plaintiff was given an out of work note for the next five days and a referral to a spine surgeon.
5. On August 8, 2006, plaintiff fell while at his home and an ambulance was called because he could not get up.
6. On August 9, 2006, Dr. Scott Ellison performed a right L4-5 microdiskectomy/lumbar laminotomy on plaintiff. Plaintiff was discharged from the hospital on August 10, 2006.
7. Plaintiff returned to Dr. Ellison on September 11, 2006, where he presented with a cane. Dr. Ellison noted in his office report of that date that the use of a cane this far from the type of surgery that plaintiff had undergone was not typical.
8. Plaintiff continued to treat with Dr. Ellison for his back injury and returned for a follow-up visit on October 30, 2006, where he reported pain in the iliac region. After performing a physical exam, Dr. Ellison noted that plaintiff stated his back pain was equal in discomfort to *Page 4 
his right leg pain, but Dr. Ellison believed that plaintiff's behavior seemed somewhat exaggerated.
9. Dr. Ellison also noted that plaintiff's hip pain would not typically be related to a lumbar neurocompressive phenomenon. However, Dr. Ellison ordered another MRI and he released plaintiff to return to work at four hours a day with no lifting of over five pounds.
10. On November 1, 2006, plaintiff underwent a second MRI of the lumbar spine. Dr. Ellison reviewed the MRI on November 9, 2006, and noted that it showed degenerative disc signal changes at the L1-2, L2-3, L4-5 and L5-S1 levels with post microdiskectomy changes present on the right at L4-5. Dr. Ellison indicated that plaintiff might respond to a right L4-5 re-do lumbar microdiskectomy, but he was not sure if the surgery would address all of plaintiff's symptoms, some of which could not be explained by the objective findings. Dr. Ellison released plaintiff with the same work restrictions which he had imposed at the previous visit.
11. Plaintiff next saw Dr. Ellison on November 27, 2006, with continued complaints of pain in his hips radiating to his right leg and foot, with tingling and occasional pain in the left leg down to the foot. Plaintiff expressed his desire to undergo additional surgery but stated that he wanted to wait six weeks until after the holidays. Dr. Ellison released plaintiff to return to work with a five pound lifting restriction. Unlike on previous visits, Dr. Ellison did not place any restriction on the amount of hours plaintiff could work.
12. Plaintiff last saw Dr. Ellison on December 27, 2006, and indicated that he wanted a second opinion. Dr. Ellison discussed the future of plaintiff's surgery with him and stated that he did not expect him to be disabled, but rather that he would expect him to be employable. Plaintiff's five pound lifting restriction was continued at this visit. *Page 5 
13. Defendant-employer is a staffing or placement service which provided employers with temporary workers for light industrial, industrial, and clerical employment. Defendant-employer has a modified duty program for individuals with work-related injuries and work restrictions. The purpose of the modified duty program is to match the injured employee with a customer that could accommodate the restrictions, or bring the injured worker into defendant-employer's office and accommodate the restrictions there. Defendant-employer believes that an individual should stay as physical as possible within the parameters of the restrictions given by the treating physicians.
14. Renee Wright is Regional Manager for defendant-employer. Ms. Wright's job duties involve recruiting and placing temporary workers and handling all workers' compensation claims for defendant-employer's North Carolina, South Carolina and Georgia offices. According to Ms. Wright, the modified duty program offered by defendant-employer is beneficial to injured workers in that it allows them to be able to do something other than stay at home.
15. Ms. Wright was familiar with plaintiff's workers' compensation claim and was aware that he had undergone surgery for a back injury on August 10, 2006. Ms. Wright was also aware that plaintiff was given a clearance by Dr. Ellison to return to modified duty on October 30, 2006. Ms. Wright knew the restrictions that plaintiff had been given by Dr. Ellison, because they were sent to her by the nurse case manager.
16. The day she received the restrictions, Ms. Wright contacted Rowan Helping Ministries to see if they could accommodate plaintiff's restrictions. Upon learning that they could, Ms. Wright sent a letter to plaintiff on October 31, 2006, explaining that modified duty work was available to him. *Page 6 
17. Plaintiff would be assigned to Rowan Helping Ministries to answer telephones and file paperwork, and would have been paid to do this job. Rowan Helping Ministries paid other individuals to answer phones, as well.
18. If the position with Rowan Helping Ministries did not work out, plaintiff could be sent back to defendant-employer to work in the office where plaintiff could put together applications, make copies, and answer telephones.
19. After receiving the letter offering light duty work, plaintiff contacted Ms. Wright to discuss the job and plaintiff's particular duties. Plaintiff informed Ms. Wright that he felt like he would be able to do the job and agreed to return to work on November 8, 2006.
20. Plaintiff failed to show up for work on November 8 and did not call to say that he would not be coming to work or to express any concerns about whether or not he would be able to do the job in question.
21. Defendant-employer maintains a policy relating to employees reporting unscheduled absences. According to the policy, every employee is required to call in within an hour prior to starting work if the employee is going to be out. If an employee fails to show up without reporting that he will be absent, then defendant-employer assumes that the employee has quit. This policy is applied evenly to all employees.
22. Plaintiff admitted that he received a letter dated October 31, 2006, telling him that they had a "position for me . . . filing papers and answering the phone," and instructing him to show up for work on November 8, 2006. Plaintiff also confirmed that he called Ms. Wright and inquired about the job, and that Ms. Wright told him that the job would include answering phones and doing filing. Plaintiff admitted at the hearing that he could do the filing and that he *Page 7 
could answer phones. Plaintiff testified that he did not take the job because his attorney advised him not to.
23. Plaintiff did not show up for work on November 8, 2006, and did not notify Resolve that he would not be reporting to work.
24. On November 8, 2006, plaintiff's counsel wrote defense counsel advising that plaintiff would defer acceptance of any offer of employment to return to Resolve Staffing in their internal modified duty program until such job is approved by the North Carolina Industrial Commission. There is no such approval process at the Industrial Commission.
25. On that same day, defendant-employer sent plaintiff a correspondence notifying plaintiff that his failure to report to work or notify the defendant-employer was a violation of the attendance policy and was considered a refusal of available work. The letter also directed plaintiff to contact Ms. Wright by November 16, 2006, and stated that a failure to do so would be considered a voluntary resignation from employment. Plaintiff was ultimately terminated from his employment with defendant-employer for violating the attendance policy.
26. Defendants agreed, as was memorialized in a letter dated January 26, 2007, from plaintiff's counsel to Deputy Commissioner DeLuca, to pay a closed window of temporary total disability benefits from August 2, 2006, to October 31, 2006, and authorized plaintiff to see Dr. Adamson of Carolina Neurosurgery Spine Associates for treatment within 30 days.
27. Dr. Adamson refused to treat plaintiff and, ultimately, the parties agreed to allow Dr. Del Curling to assume plaintiff's treatment.
28. Dr. Curling is a neurosurgeon and a board certified Independent Medical Examiner. Dr. Curling initially saw plaintiff on June 5, 2007, and has assumed plaintiff's treatment with respect to his back injury. *Page 8 
29. Dr. Curling has reviewed all of plaintiff's treatment records and diagnostic tests relating to his back injury, including plaintiff's pre-operative MRI from August 4, 2006, and the post-operative MRI from November 1, 2006. Dr. Curling opined that the post-operative MRI indicated that plaintiff's ruptured disc at the L4-5 level had been removed.
30. Dr. Curling performed a physical examination on plaintiff at every office visit. According to Dr. Curling, these examinations never revealed any neurological deficits, loss of sensation or loss of muscle strength. Further, Dr. Curling opined that plaintiff could work at a sedentary to light-duty job, with lifting of no more than ten pounds, and that these restrictions would have been applicable each time he saw plaintiff in his office.
31. Although Dr. Curling did not see plaintiff in the period from December 27, 2006, when plaintiff was last seen by Dr. Ellison, until June of 2007, when he first presented in Dr. Curling's office, he nonetheless believed that plaintiff still would have been capable of working within these restrictions during that period of time.
32. Dr. Curling opined that assuming the position with Rowan Helping Ministries was sedentary, he would expect that plaintiff would be capable of performing the work.
33. Plaintiff has not searched for work in any capacity since his refusal of the light duty position offered by defendant-employer in November 2006.
34. Plaintiff is not at maximum medical improvement.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 9 
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to his back on August 2, 2006. N.C. Gen. Stat. § 97-2(6). Plaintiff was temporarily totally disabled from August 2, 2006 until November 8, 2006. Russell v.Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
2. Plaintiff's termination from employment with defendant-employer is attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's termination on November 8, 2006 constitutes a constructive refusal to perform the work provided.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397
(1996).
3. Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that his inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Seagraves v. Austin Co. of Greensboro,supra.
4. In the case at bar the greater weight of the evidence shows that after his termination plaintiff was capable of some work, that it would not have been futile for him to look for work due to pre-existing conditions, that plaintiff did not make a reasonable effort to find other employment, and that no doctor took him out of work. Demery v.Perdue Farms, Inc., 142 N.C. App. 259, 545 S.E.2d 485 (2001). Therefore, after November 8, 2006, plaintiff failed to prove that he was disabled from employment due to the compensable injury and is not entitled to any compensation. N.C. Gen. Stat. § 97-29; Seagraves v. Austin Co. ofGreensboro, supra.
5. Plaintiff's temporary total disability benefits are suspended beginning November 8, 2006 and continuing until plaintiff's refusal of suitable work ceases or until further Order of *Page 10 
the Commission. N.C. Gen. Stat. § 97-32. Plaintiff was paid $3,520.02 for his period of disability from August 2, 2006, until October 30, 2006, pursuant to an agreement between the parties. Defendants are entitled to a credit for the payment made for this period of time. N.C. Gen. Stat. § 97-42.
6. The Rehabilitation Professional's failure to simultaneously notify the parties of Dr. Ellison's assigned restrictions on October 30, 2006, was at most a technical error which did not prejudice plaintiff. Rules for Utilization of Rehabilitation Professionals, Rule VI.
7. The Rehabilitation Professional's failure to provide plaintiff's counsel with a written job description of the position that defendant-employer intended to offer plaintiff, prior to offering the position to plaintiff, was not under the circumstances a violation of the North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals. Rules for Utilization of Rehabilitation Professionals, Rule VIII.
8. Plaintiff is not entitled to a 10% penalty for failure to pay compensation to plaintiff within 14 days of coming due. N.C. Gen. Stat. § 97-18(g).
9. Defendants are required to provide plaintiff with reasonably necessary medical treatment related to his compensable back injury that tends of effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-25 and 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff is entitled to temporary total disability benefits for the period from August 2, 2006 through November 8, 2006. Defendants have already paid plaintiff, pursuant to *Page 11 
the agreement between the parties, a lump sum of $3,570.02 for lump sum compensation paid for plaintiff's disability for the period from August 2, 2006, to October 30, 2006. Thus, plaintiff is entitled only to additional compensation for the period between October 30, 2006 and November 8, 2006.
2. Plaintiff's claim for a 10% penalty, pursuant to N.C. Gen. Stat. § 97-18(g), for failure to pay compensation within 14 days of coming due is DENIED.
3. Defendants shall pay all medical expenses incurred or to be incurred as a result of the compensable back injury as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, subject to the limitations of N.C. Gen. Stat. § 97-25.1.
4. Each side shall pay its own costs, except defendants shall pay an expert witness fee of $525.00 to Dr. Otis D. Curling, if not already paid.
This the 22nd day of September, 2008.
 S/___________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
S/___________________
LAURA KRANIFELD MAVRETIC
COMMISSIONER
S/___________________
DANNY LEE McDONALD
 COMMISSIONER *Page 1